## MILLER *v.* CHICAGO, M. & ST. P. RY. Co.

### (*Circuit Court, W. D. Missouri, W. D.* March 11, 1890.)

**1. MALICIOUS PROSECUTION—PROBABLE CAUSE—ADVICE OF COUNSEL.**
In a suit against a railway company for malicious prosecution for arson, a demurrer to plaintiff's evidence will be sustained where it appears that a depot of such company was burned by an incendiary; that the company's agent, upon investigation, was informed by several persons of circumstances constituting a strong chain of evidence against the plaintiff; that such agent laid these facts before the company's local attorney, who, out of abundant caution, placed them before the county prosecutor; and that the latter examined all the persons concerned in furnishing the information, and then advised the prosecution of plaintiff, in which advice the company's attorney concurred.

**2. SAME.**
In a suit for malicious prosecution, a *prima facie* case of good motive and of probable cause is made out when it appears that the prosecuting witness took the advice of counsel, and also placed all the facts before the county attorney, who thereupon advised the prosecution.

**3. SAME—COMMITMENT BY MAGISTRATE.**
The fact that a magistrate, after a hearing, committed the accused, makes out a *prima facie* case of probable cause for instituting the prosecution.

**4. SAME—GRAND JURY.**
Leaving out of consideration the committal of an accused person by a magistrate after a hearing, the fact that the grand jury ignored the bill against him makes out a *prima facie* case of want of probable cause for instituting the prosecution.

**5. SAME—BURDEN OF PROOF.**
When a magistrate, after a hearing, has committed an accused person, and the grand jury has then ignored the bill, these two facts, upon a suit for malicious prosecution, neutralize each other; and the plaintiff, to sustain his case, must produce other evidence of malice, and of want of probable cause for instituting the prosecution.

**6. SAME—EVIDENCE.**
Where a criminal prosecution was based largely upon information given by one person, but such information was corroborated by independent circumstances, and also, as to part thereof, by other persons, it was not incumbent upon the prosecuting witness, a stranger in the neighborhood, to make inquiries as to the reputation of such person for veracity.

**7. SAME.**
It is not incumbent upon a person about to institute a criminal prosecution to go to the house of the suspected person, and inquire of him whether he remained at home on the night the crime was committed, and whether his two daughters would testify to that effect.

**8. SAME.**
Rev. St. Mo. 1879, § 2100, provides, among other things, that when the grand jury ignores a bill against a person committed by a magistrate, the costs shall be paid by the state if the grand jury shall certify that there was probable cause for the prosecution. *Held*, that where the record only shows that the bill was ignored, and judgment was entered against the state for costs, it must be presumed, in a collateral proceeding, that such certificate was made.

9. PRACTICE—DEMURRER TO EVIDENCE.
    There is no difference between the practice of state and federal courts as to tak-
    ing cases from the jury. The rule in both is that it will be done when the facts
    appear so strongly upon one side that, if the jury returned a verdict for the other,
    the court would feel constrained to set it aside.

Action for Damages.

This suit was brought by T. H. B. Miller against the Chicago, Milwau-
kee & St. Paul Railway Company for maliciously causing his arrest and
imprisonment upon a charge of arson in burning its depot at Niantic,
Livingston county, Mo. Plaintiff was tried before a committing magis-
trate, and held to answer to the grand jury. The grand jury ignored
the bill, whereupon this suit was instituted. At the trial, the question
under investigation being whether the defendant's agents acted without
probable cause in instituting the prosecution, it was claimed on behalf
of the plaintiff that one Kennedy, a section hand, upon whose infor-
mation, supported in part by others, the prosecution was begun, was a
man of bad reputation as to veracity, and that defendant's agents were
negligent in not ascertaining that fact and acting accordingly. Upon
this point the following proceedings were had:

"*Mr. Waters*, [for plaintiff.] I propose, with the permission of the court,
to read the testimony upon the preliminary examination, showing the char-
acter of this man Kennedy, whom they relied on for their information. *The
Court.* I examined that question last evening, Colonel, and I am satisfied
that the evidence of those witnesses is incompetent until you establish a
foundation showing that this party had some reason to believe that he was
not a man of veracity. The rule in that respect is that the law presumes that
every citizen has a good character, that he lives in the peace of the state, and
that he is a man of truth and veracity, until the contrary is made to appear.
In dealing with our fellow-citizens, we have the right to assume that men tell
the truth, and that what they state is true, without instituting an inquiry
in the neighborhood to ascertain whether they are under tongue of good re-
pute. Of course, if a man has information, and don't show diligence in
certain contingencies of physical facts, sometimes he is held liable for what
he might have ascertained. But in this particular the presumption is in favor
of the good name and reputation of every citizen until the contrary appears;
and, until you can show that the prosecution in this case had possession of
facts and circumstances which should have put them upon inquiry as to the
character of this man, I cannot admit that evidence. *Mr. Waters.* The ground
on which I offered it was this, your honor: The prosecutor swears that he
acted upon the information that he obtained from two of the defendant's em-
ployes,—Watson, the detective; Kennedy, the section man; and so much more
reliance, according to his own statement, did he place upon Kennedy than
upon the detective, that he would not act until he had talked with the section
man, who then came in and gave him the information. Now, there are two
of the defendant's employes, not strangers, carrying information to the pros-
ecuting attorney. It is not a charge on the prosecuting attorney that he
ought to have noticed, but the defendant or its servants who were engaged in
this prosecution; and he insisted upon it, and had that man to come down
there, and then, upon the information got from both employes, he advised this
prosecution. Now, if that employe who is furnishing the evidence for the
state, upon which the state was giving its opinion, was a man of notoriously
bad character in the neighborhood, it occurs to me that it is proper to show
that. *By the Court.* Here is a witness, the prosecutor, who did not live in

that neighborhood at all, and he is not supposed to know what is common fame in it; and if a party is to be subjected to an action for malicious prosecution upon the ground that a person who lives in the neighborhood comes to him and tells him certain facts, as this witness does, and it afterwards turns out that they can get a lot of witnesses to impeach the veracity of that witness in the methods ordinarily known, and that the man was not under the tongue of good repute, why, no man would be safe in instituting a prosecution of that sort. I don't think that evidence is admissible in any state of the case, because this case is to be tried as the facts then appeared to the party instituting the prosecution, from the best lights he had before him. I don't think the law will justify me in going to the extent of saying that he should institute an inquiry in that neighborhood to ascertain whether anybody would come in and swear that that man was not a reputable citizen, and not worthy of credibility. I am not able to find any case or any principle that goes to that extent, and I gave the case considerable examination last night. The other rule, that a man has to give to his attorney the information that he has, or which he might have known by the exercise of ordinary diligence, runs in a different direction from this; and I do not think any case can be found, or any principle of law, that would carry the rule to the extent that is sought in this case; and, until more is developed, I shall have to exclude that evidence."

At the conclusion of the plaintiff's evidence, which is sufficiently set out in the opinion, the defendant demurred thereto.

*L. H. Waters* and *R. A. Debolt*, for plaintiff.

*Pratt, McCrary, Ferry & Hagerman,* for defendant.

PHILIPS, J., (*orally*.) The question to be decided here arises on a demurrer to the evidence, or an instruction asked on the part of the defendant to the effect that, notwithstanding the evidence introduced on the part of the plaintiff, the jury should find the issues for the defendant. Such a demurrer, of course, admits the truth of the facts as established by the evidence on the part of the plaintiff, and such inference as a jury might be warranted in making therefrom within the bounds of reason. So this demurrer is to be considered upon that theory of the evidence. The law in respect to actions for malicious prosecution imposes upon the plaintiff the burden of proof. It devolves upon him to prove, in the first instance, that there was a prosecution instituted and inaugurated by the defendant against him for some offense. It devolves upon the plaintiff, in the next place, to prove that the charge made or preferred by the prosecutor was false; next, that the defendant was instigated by malice against the plaintiff; and next, that he made the charge without reasonable or probable cause to believe the plaintiff guilty. And, unless all these facts be proved to the satisfaction of the jury, they should find for the defendant. This burden the plaintiff has assumed in this case; and the question is, has he presented a *prima facie* case that would entitle him to take the opinion of a jury?

In the first place, the pleading itself alleges, and the plaintiff's evidence shows, that, upon an investigation had and a trial conducted before the magistrate, the magistrate found that an offense had been committed, and that there was probable cause to believe the plaintiff here, Miller, was the guilty party. The petition further avers the fact that

the grand jury, upon a subsequent investigation, failed to find a true bill against the defendant. They ignored the bill, and thereupon the defendant, Miller, in that proceeding was discharged. Now, the first question which presents itself for determination is, what is the legal effect, and what is the legal conclusion to be drawn from, these two adverse actions of the two judicial bodies? The very matter under consideration before the trial magistrate is the question of the existence of probable cause. That is the fact upon which he passes. He has no jurisdiction to determine the final guilt of the party; but the object of the investigation is to determine, in the first place, whether an offense has been committed against the peace and dignity of the state; and second, who is the guilty party, or whether there is probable cause to believe that the party charged is the offender. The magistrate has ample jurisdiction for this purpose. He proceeds according to the usages and forms which have obtained in courts of justice for the administration of law. Evidence is heard, both for the prosecution and for the defense. The state is represented by the county attorney, and the defendant is entitled therein to demand his constitutional privilege of being heard by counsel, and to have the process of the court for witnesses, and a full trial and inquiry into the whole facts of the case in determining the existence or non-existence of the fact of probable cause. Of course, it has all the dignity and solemnity of a judicial proceeding. The books all say that, where the committing magistrate finds there is no probable cause to believe the defendant is the guilty party, this conclusion and judgment of the magistrate present a case of most persuasive evidence that the prosecution is without probable cause; and counsel for plaintiff, in such case, perhaps is right in saying that, in the trial of an action for malicious prosecution, plaintiff might, after the usual preliminary proofs and the identification of the parties, etc., safely rest upon the judgment of the magistrate acquitting the defendant of the charge. It thereby presents a *prima facie* case, and perhaps the burden of proof would then devolve upon the defendant to show the existence of probable cause, and the absence of malicious intent. But this is not the case here. The magistrate found there was probable cause; and, if acquittal is most persuasive evidence of the absence of probable cause, the counterpart of the proposition ought to obtain,—that committal makes out a persuasive case for the defendant; that there was probable cause for the institution of the proceeding. And if there was probable cause, no matter what the motive or intent of the party may have been in instituting the proceeding, the question of malice plays no part. Now, what is the effect of the subsequent action of the grand jury in ignoring the bill upon this prior adjudication of the magistrate? The books show, and the adjudicated cases say, that, independent of the action of the magistrate,— where there has, perhaps, been no action by the magistrate at all,—the action of the grand jury in ignoring the bill also presents a *prima facie* case for the plaintiff in such prosecution. If that be so, why, then, we have presented here two opposing *prima facie* cases of a persuasive character,—one predicated on the finding of the magistrate, in favor of the

defendant in this case; and one predicated upon the action of the grand jury in ignoring the bill, in favor of the plaintiff here. Counsel for plaintiff in the trial of this cause, and in the argument on the demurrer to the evidence, concedes that it would not have been safe, under that state of the proofs, for him to have rested his case upon the action of the grand jury; to go to the jury upon the idea of having made out a *prima facie* case by introducing in evidence the action of the grand jury, after the evidence was before the jury of the action of the justice of the peace, the committing magistrate. Leaving the case, then, in that attitude alone, without discussing here the question of the effect of the ignoring of the bill by the grand jury, it devolved upon the plaintiff, upon this state of the proof, to go further, in order to make out a *prima facie* case before the jury. The *prima facie* instances, then, were, I think, evenly balanced upon that aspect of the case; and it devolved upon him to go further, and show, in fact, to the jury, that the charge was false, or that the party was actuated by malice in preferring, and had no reason or probable grounds for preferring, this charge. The effect of this action of the grand jury under our statute, while it is not, perhaps, material to the conclusion the court may reach in this discussion, may, nevertheless, be adverted to and considered. Section 2100 of the Revised Statutes of Missouri of 1879 provides:

"If a person, charged with an offense punishable with death or imprisonment in the penitentiary alone, shall be discharged by the officer taking his examination, or if he be recognized or committed for such offense, and no indictment be found against him, the costs shall be paid by the prosecutor or person on whose oath the prosecution was instituted, and judgment shall be rendered therefor, as provided in the two next preceding sections, unless the officer taking the examination, or the grand jury before which the same is investigated, shall certify that there was probable cause for the prosecution, in which event the costs shall be paid by the state."

The record of the proceeding had before the grand jury of the circuit court shows that the grand jury, on the 25th of July, returned into court the following presentment, to-wit:

"*State of Missouri* vs. *H. B. Miller*.

"The grand jury find no bill. A. McVay, Foreman.

"Whereupon it is ordered and adjudged by the court that the defendant herein be discharged, and that he have and recover of plaintiff his costs herein expended."

—From which it appears that the circuit court, into which that indictment was returned, proceeded to render judgment against the state for costs. The record before me, which is a transcript of the judgment, and not more, under the certificate of the clerk, simply shows that the court, upon the return of the grand jury, "No bill found," proceeded to enter up judgment against the state for costs. It is contended, and admitted by the learned counsel for the plaintiff in this case, that the court was only authorized to do that in the event the grand jury made a certificate that there was probable cause for the prosecution. In that instance the court is authorized to render judgment against the state for the costs. It has done so in this case. The contention of

counsel, however, is that the court had no jurisdiction to enter that judgment in the absence of the necessary or prerequisite certificate of the grand jury certifying that there was probable cause for the prosecution. But the question presents itself, on that aspect of the case, what is the effect of the action of the court in rendering this judgment? There is nothing here before the court to show that this is a full and complete transcript of all the proceedings had in the case, and of all the papers on file. The grand jury are required to make this certificate,—not necessarily to be made upon the indictment itself; not necessarily to be incorporated in their finding on the bill; but they could make the certificate upon a separate piece of paper, or in any form. The question is, what is the conclusion to be drawn in a collateral proceeding from this action of the circuit court in thus making the judgment, when it is not authorized to render it except upon the certificate of the grand jury that there was probable cause? It is a fundamental principle that every intendment must be made in favor of the judgment rendered by a court of general jurisdiction; while in courts of limited jurisdiction the facts, whether they exist *in pais* or by record, which confer jurisdiction upon them, and authorize them to proceed, must appear affirmatively upon the record. But when a court of general jurisdiction, having jurisdiction of the subject-matter, proceeds to judgment, every intendment must be indulged in favor of the judgment,—that all the prerequisite facts to authorize the court to take jurisdiction and render the judgment were found by the court to exist. Reference to a few authorities on this subject will indicate what is in the mind of the court in this connection. In the case of *State* v. *Brown*, 75 Mo. 317, Chief Justice SHERWOOD, in passing on a question in a criminal case, says:

"It is true that section 1909 of the General Statutes provides that the court, ‘with the consent of the prosecuting attorney and the defendant, * * * may permit the jury to separate, * * * except in capital cases;’ but that statute nowhere provides that the record shall recite the fact of consent given. In the absence, then, of any objection appearing to the separation of the jury, the presumption will be that the necessary consent was given. Such presumptions always attend the acts and doings of courts of general jurisdiction."

In *State* v. *Burns*, 85 Mo. 47, it is said:

"Every presumption attends the acts and doings of a court of general jurisdiction; and a party who asserts that error has been committed must prove it."

In *Gates* v. *Tusten*, 89 Mo. 13, SHERWOOD, J., says, on page 18:

"It is one of the fundamentals of the law that, where the record of a court of general jurisdiction shows that it assumed to exercise jurisdiction over persons or subject-matter, that in the absence or silence of the record as to any fact showing the acquisition of jurisdiction, or how it was acquired, that then jurisdiction is to be presumed; for the rule is that ‘nothing shall be intended to be out of the jurisdiction of a superior court, but which specially appears to be so.’"

So, again, the court say, in *Schad* v. *Sharp*, 95 Mo. 573, 576, 8 S. W. Rep. 549:

"Nothing appearing in the record to show that the land was not in that county, and the circuit court being a court of general jurisdiction, it will be presumed to have exercised its jurisdiction rightfully, and 'nothing shall be intended to be put out of the jurisdiction of a superior court but which specially appears to be so.'"

So, again, in *City of St. Louis* v. *Lanigan*, 97 Mo. 175, 180, 10 S. W. Rep. 475, SHERWOOD, J., says:

"'Nothing should be intended to be out of the jurisdiction of a superior court but that which specially appears to be so.' *Schad* v. *Sharp, supra.* Such courts proceed by right, and not by wrong; and the presumption that they do so will attend their acts and doings, even in causes coming up to this court on error or appeal."

. So that the presumption ought to be, nothing to the contrary appearing, that the court had the right to render the judgment; and, its right being predicated upon the certificate of the jury that there was probable cause, the presumption should be indulged, in favor of the judgment, that the court found the precedent act to exist. But waiving that, as a point not necessary to be decided in this case, it has been held under a statute similar to ours, though without this provision respecting the certificate of the grand jury on the question of costs, that the greater effect is to be given to the action of the committing magistrate in committing the plaintiff. In the case of *Ganea* v. *Railroad Co.*, reported in 51 Cal. 141, the court says:

"It is well settled that, in order to maintain an action of this character, want of probable cause must be affirmatively established by the plaintiff. It is conceded that, when the plaintiff proved that he had been held to answer by the examining magistrate, he so far forth establishes, *prima facie*, the existence of probable cause for the prosecution of which he now complains. We have been unable to discover any fact or circumstance in evidence which could be fairly said to overcome, in this respect, the effect of the order made by the examining magistrate holding the plaintiff here to answer to the charge. The subsequent ignoring of the charge by the grand jury did not have that effect. Under the system of criminal law prevailing in this state, the deliberations of the grand jury are not, as formerly, a mere examination of the case of the prosecution. The proceeding before the grand jury is, in fact, a preliminary trial, and one in which the accused may appear by his witnesses, and make his defense, and may himself be sworn and testify in his own behalf. The favorable result of such a trial certainly affords no evidence of want of probable cause. The prosecution, in the first instance, does not seem to have been hastily or inconsiderately set on foot. It was only after an anxious and careful consideration, a deliberate examination of all accessible means of information as to the fact of the alleged perjury, both by the local attorney and local agent of the defendant, that it was determined that legal proceedings against the plaintiff here should be initiated. There are no circumstances indicating that the prosecution originated or was conducted in consequence of malice or any reprehensible motives upon the part of the defendant."

So we may say, for the purposes of this case, in deference to the apparent inclination of the judicial mind in the state jurisdiction, that the plaintiff has not made out a *prima facie* case here by showing that the

bill was ignored by the grand jury, in view of the fact of the precedent action of the committing magistrate in finding that there was probable cause; in other words, that those two *prima facie* inferences counterbalance each other. Then it devolved upon the plaintiff to go further, and show, not only that this charge was false in fact, but that at the time it was instituted by the prosecutor there was no reasonable ground to suppose that the defendant was guilty. Judge HOUGH, in the case of *Sharpe* v. *Johnston*, 76 Mo. 670, quotes with approbation the definition of the term "probable cause" as given in *Vansickle* v. *Brown*, 68 Mo. 635, as follows:

"In our opinion, that reasonable and probable cause which will relieve a prosecutor from liability is a belief by him in the guilt of the accused, based upon circumstances sufficiently strong to induce such belief in the mind of a reasonable and cautious man."

This cause is to be determined here with a view to the facts and circumstances as they then appeared to the mind of the prosecutor, and upon the theory as to whether they were of such character as would have produced a belief in the mind of a reasonable and cautious person that the defendant was probably guilty. Of course, if the plaintiff would proceed in this case, and show that, notwithstanding there may have been on the surface—on the appearance—of these facts sufficient to have persuaded the mind of a reasonably cautious man of the probable guilt of the defendant, yet that the prosecutor in fact knew Miller was innocent, or that he was in possession of such facts as would have led to a discovery of that fact,—that is, by the exercise of ordinary care and diligence he could have discovered the fact of innocence, which was lying about, patent and obvious to him,—then plaintiff might have made out a case. It is not sufficient to show that the prosecutor was actuated by malice, unless the proof shows the additional fact that there was no probable cause, and that the circumstances under which he acted were such that, in the absence of proof of probable cause, malice might be inferred. Now, as a matter of course, it will be understood that in passing on this demurrer the court can only pass upon the facts which are undisputed. Disputed facts, controverted facts, facts from which different minds might draw different conclusions, are always for the jury. They belong to the jury, and not to the court. But, where the main facts in a case are undisputed and are conceded, it becomes a question of law, for the court to determine, what is the result from these facts thus admitted.

The evidence in this case shows, without any controversy, that on the night of the 8th of October, 1887, the depot of the defendant was burned at a station known as "Niantic." Property shown by the evidence to be worth from two to three thousand dollars was destroyed in a night. That it was the act of an incendiary the evidence in the case quite clearly proves. There were attendant circumstances on that fire, and facts discovered there immediately succeeding it, such as to leave no ground of doubt in the mind of a reasonable person that its destruction was wanton and intentional. The defendant appeared shortly thereafter on the

ground, through its agent Mr. Watson, as was its right and its duty to do, not only for the protection and preservation of its own property, but in the public interest, as a conservator of the public peace, to bring the offender against the peace and dignity of the state at large to justice. It instituted inquiry to ascertain, if possible, who it was committed this act. The facts discovered by Watson were, in the first place, the evidence of the incendiarism. The next was the statements made to him by the witnesses who appeared upon the ground early the next morning that they discovered a track coming down the railroad from the north in the direction of this depot; that a kerosene lamp had been taken from a switch-post and carried to the platform of the depot; that coaloil, or something of that kind, was found there in a jug; and then that this same track, which had thus come down the railroad ties or the railroad right of way, went back. These parties, three in number, traced these foot-steps some distance up the railroad track; and, within a quarter or half a mile or so of the depot, they discovered, according to their statements and representations to this agent, and as they afterwards stated to the county attorney, who investigated the matter before he instituted the prosecution, and as these parties swore on the trial, a patch of a sole of a shoe or boot fastened in between the ties of the road, either pulled off by being caught between the ties, or by the suction of the mud. They traced thereafter this foot-step, two or three of them, up to a point known in the evidence in this case as the "Grabast Crossing." There two of the parties who constituted this number stopped, and went no further; and one of the parties, named Kennedy, stated to this prosecuting witness, also to the county attorney, and also swore to it before the committing magistrate, that he traced the foot-steps to the rear door of the plaintiff's, Miller's, drug-store. The evidence further shows that as it became important, in the judgment of those intrusted with the investigation of this matter, to ascertain from what shoe or boot this patch came, and, having traced these foot-steps, as claimed by the witness Kennedy, to the business house of Miller, the man Kennedy was sent there to see if he could find the boot or shoe from which this was taken. The fact was further brought to the attention of the agent of the railway company that this man Miller, on the morning succeeding the fire, and perhaps by 9 or 10 o'clock of that morning, when requested by his neighbor to go down with him to the fire, complained that his boots leaked, and that he needed another pair of boots, and bought from him that morning a pair of boots, either gum or water-proof. That fact was brought to the attention of the prosecuting witness. In addition to that, as it was supposed to be important to know whose shoe or whose boot this patch came from, the man Kennedy was sent to these premises; and, on searching in the rear room of the man Miller's drug-store, an old pair of boots was found that presented the appearance of having lost part of the sole, and having the appearance of newness and freshness about it. That boot was taken, and the matter was traced to the shoe-maker who put this patch upon this boot. One shoe-maker stated that the patch came from that boot, on examining it; and the shoe-maker who put the patch

on the boot stated positively, and he afterwards swore to the fact, that he did it for Dr. Miller, possibly in the spring before; and the evidence showed that the boots in question belonged to Dr. Miller. The evidence furthermore showed, by statements of Miller, that he was out that night, or the evening, perhaps, before, and some time during the night.

Now, these were the prominent facts and the salient points in the case. They were laid before the local attorney for the railroad company, Judge Broaddus, of Chillicothe, a gentleman of the highest repute, who has occupied judicial position in the state; a man of honor and learning, and of high attainment in his profession. Recognizing the delicacy of his position, and from a sense of modesty, he had this party, in the first place, lay these matters before the county attorney. He went to the county attorney, and stated these facts in their general substance, and with particularity, without any expression of opinion on his part. He laid all the evidence in his possession at that time before the county attorney. The county attorney—the representative of the state, the conservator of the peace, intrusted with the duty of instituting and conducting such prosecutions, (the man Watson being a non-resident of the state, and a stranger to him)—took the precaution to have these witnesses, by whom he was told these facts could be shown, brought before him and examined; and he states that these witnesses detailed the facts and circumstances to him just as they had been given by the man Watson. There is no evidence on the part of the prosecution that the witness Watson misrepresented a single fact to the county attorney in that statement, unless it be in the particular as to the information obtained from the young man Davis. Now, the evidence on the part of the plaintiff here is that this was a matter that transpired subsequent to the statements made by the prosecuting witness to the district attorney respecting the man Miller. The idea of proceeding against anybody else, or including anybody else in the prosecution, than the man Miller, seems to have originated altogether with the county attorney, and with him as a precautionary measure. The evidence shows that, in the mind of the prosecuting witness, Miller was the guilty man; and Watson's statement to him was entirely respecting the man Miller. Upon inquiry by the prosecuting attorney about Jim Davis and the young man Dudley, who was the clerk of the defendant, Miller, out of precaution, and for fear that the evidence might ultimately tend to show that they were implicated, and to prevent their becoming alarmed and escaping, the county attorney advised that they also be arrested. A statement was made to him, he says, by Watson, that old man Davis, and perhaps Dudley, were out that night with Miller; and that he is not certain as to whether the witness Watson said he got this information from young Davis direct, or whether he learned it in some other way through him. His impression is that Watson had it from the young man. It seems to me that this, coming up as it did, and in connection with the other facts, in no wise affected the defense of Miller, or his action in in this case. It is an immaterial fact, and the very most that could be affirmed of it is that it would be a collateral and incidental matter, which

would not at all affect the prosecution with respect to Miller.   Every
statement made by the prosecutor, Watson, the county attorney found
to be true, so far as the statements of witnesses to Watson were con-
cerned.   The witnesses stated the facts to him just as Watson had rep-
resented them; and they went upon the stand in the justice's court, and
swore to the facts.   The facts thus developed and disclosed to the pros-
ecuting attorney were of such a persuasive character as to leave no doubt
in his mind that the defendant was guilty, and that there was probable
cause.   Then Judge Broaddus, after the county attorney reached his
own conclusion, independent of any act or suggestion of his, also con-
curred in the conclusion.   So that this party, by the course he took in
laying the facts simply as they had come into his possession before the
law-officer of the county, the representative of the state, and before the
attorney of the railroad company, did not manifest any malignant spirit,
nor any bad disposition nor haste, to institute this prosecution upon his
own judgment; but left it to the representative of the state, and to the
conservative counsel of the railroad company itself, who reached the con-
clusion, without any hesitancy, that the facts justified the prosecution.
Now, attach what importance we may to the advice of counsel, the fact
remains that the prosecutor did take the advice of counsel, and that the
prosecution was instituted at the instance of the county attorney.   The
papers were prepared by him, and sworn to by the prosecuting witness.
Now, the rule in the federal jurisdiction, as laid down in 98 U. S. 196,
in the case of *Stewart* v. *Sonneborn,* is:

"It was proved that, before they commenced their suit in the circuit court
of Barbour county, the defendants were advised by an eminent lawyer of Al-
abama, of twenty-five years' standing in the profession, respecting their legal
right to recover the debt from the plaintiff, that in his opinion the plaintiff was
liable therefor.   It was further testified that the same lawyer advised them
that in his opinion the plaintiff had rendered himself liable to involuntary
bankruptcy proceedings by suffering his brother's judgment to go against him
by default, and by advertising his entire stock of goods at and below New
York cost.   It was not until after this advice had been given that the petition
in bankruptcy was prepared and filed.   That the facts stated in the point pro-
posed, if believed by the jury, were a perfect defense to the action; that they
constituted, in law, a probable cause, and, being such, that malice alone, if
there was such, was insufficient to entitle the plaintiff to recover,—is, in view
of the decisions, beyond doubt, [citing cases.]   These cases, and many others
that might be cited, show that if the defendants, in such a case as this, acted
*bona fide,* upon legal advice, their defense is perfect."

The holding of the supreme court of this state, as indicated in the case
of *Sharpe* v. *Johnston,* in 59 Mo. 557, and again considered in 76 Mo.
660, in the mind of Judge HOUGH, at least, is that the taking of advice
of counsel presents nothing more, perhaps, than a *prima facie* case of good
motive on the part of the prosecutor, and of probable cause; that it is
not conclusive, as held by the supreme court of the United States.
Even accepting, for the purposes of this case, the rule as thus established
in this state, if the prosecutor laid before the county attorney all the facts
in his knowledge pertaining to this case, or such facts as he could have

discovered by the exercise of ordinary care and diligence under the circumstances, and the prosecution was advised and instituted upon the direction of the county attorney, he has made out, anyhow, a *prima facie* case which overcomes the evidence of plaintiff.

It is insisted, however, in this connection, on the part of the learned counsel for plaintiff, that there were exterior facts and circumstances lying about and around this case, accessible to this prosecuting witness, which he could and ought to have discovered by the exercise of that degree of diligence and vigilance which the law exacts of him. Let us see about that. The prosecuting witness, a citizen of Wisconsin, comes into this state in the employ of defendant, looking after its property interests. He happens to be in this state on other duty at the time, and hears of this matter, and goes to the place some time after the fire. He discovers these facts. He examines these witnesses. Now, it is claimed, in the first place, on the part of counsel, that this witness Watson ought to be held liable for not discovering the fact that the veracity of the man Kennedy could be successfully assailed in that community; in other words, that he ought to be charged with the fact that, by inquiry instituted therefor, he might have discovered that witnesses in that neighborhood where this man lived could be brought into court to swear that his general reputation for truth and veracity was bad, so as to affect, and probably materially impair, his credibility as a witness. Now, as I have already stated before in the progress of this trial, when that question arose, in my judgment that would carry the rule in question beyond all reason, and is without authority. The law presumes that every man is a good citizen. The law presumes that he is truthful. The law presumes that he does live in the peace and dignity of the state, and that he will not lie. And if men were not to accept upon faith the statements made to them by two or three witnesses as sufficient basis for a prosecution without first nosing around through the neighborhood to see if some man could not be found who might come into court and swear that this or that witness' reputation for truth and veracity was bad; in other words, if a man is to be mulcted for the institution of a prosecution upon the ground that he did not discover beforehand that witnesses could be called to assail the veracity of some witness called to establish some essential fact in the prosecution,—no man would be safe in instituting a prosecution in the interests of public peace. I don't think that the rule invoked by the plaintiff has any application to this instance. But, even be it conceded that Watson might have discovered that witnesses could be called successfully to assail the reputation of this man Kennedy for truth and veracity, the fact still remains, testified to by two witnesses unimpeached, and no effort to impeach them, that they accompanied this man Kennedy at least to Grabast crossing; that at least two of them were present when this patch from off the boot was discovered; and that this boot was taken and kept in possession, and shown to this prosecuting witness. And it is immaterial, for the purposes of this case, how and where the witness Kennedy got those boots, because it is admitted by the plaintiff himself, on this trial, that those were his

boots, and the proof admits of no dispute that the patch found by these witnesses at that time and place came off of his boot.

Well, what other fact is there that the prosecuting witness ought to have discovered in this case that is of an exculpatory character for the plaintiff? It is claimed here by counsel for plaintiff that the prosecuting witness ought to have gone to Dr. Miller himself, and inquired of him whether he burned that house, and learned from him whether he was at home, and whether he could prove an *alibi* by his two daughters. I presume counsel is not in earnest in such a proposition,—that before a prosecuting attorney or witness institutes proceedings he should go to the party accused, and advise him in advance of the contemplated prosecution, that he was suspected, and ask him if he was guilty or innocent. Why, the law of self-preservation, the instinct of human nature itself, would lead a man to believe that the party thus accused, even if guilty, would say he was not guilty, and that he might resort to the common defense, in such cases, of an *alibi*. The law would not exact of a prosecuting witness such diligence and vigilance as to do a thing which no reasonable man under like circumstances would do. No man, in working up a case, goes to the party accused to see if he is guilty, but ordinarily keeps his investigation to himself. He does not let the party suspected know of the investigation, for fear he may escape, until he is ready to have the *capias* served upon him. It is further claimed that he ought to have pursued the fact, developed to him by the man Kennedy, that he traced these foot-steps to the rear door of Dr. Miller's drug-store, which would have led him to discover that there was a sidewalk up in town leading out some two or three hundred feet from this drug-store, and that therefore he should have been persuaded from the discovery of that fact that perhaps the witness Kennedy had not told the truth about tracing these foot-prints up there. To my mind, there are two answers to that. In the first place, the sidewalk, part of the way, was of but two planks. The night, according to the testimony of the plaintiff himself, was hideously dark. It would be very natural for a man, in the darkness of night, to avoid walking upon a sidewalk of two planks, when he could not see his way. He knew he was safe in the street, but on the sidewalk it would be difficult for him to thread his way. But, at all events, that fact itself was not deemed of sufficient importance to the prosecution here, and the defendant there, to have been developed upon the investigation before the trial magistrate. After the plaintiff was arrested, a week intervened for preparation for trial, offering him every facility. Witnesses were brought there for the state, and witnesses for the defendant, the plaintiff here, and the trial gone through with. There was a full examination of all witnesses, evidence produced on both sides, and the case argued by counsel; and at that trial, involving the reputation and liberty of the defendant, no such importance, in his estimation, was attached to the existence or non-existence of the sidewalk as to have caused that fact to be brought out upon trial. Yet they claim that because this prosecuting witness did not discover that fact, or, if he discovered it, did not attach the same importance to it they now do for the

first time, therefore he was guilty of negligence. I think it is entirely a *non sequitur*. Also, in respect to the presence of water along the railroad track,—the other tangible fact brought out on this trial,—they insist that the presence of water in the bottom, along which the witness Kennedy claims to have traced this track next morning, ought to have suggested to this prosecuting witness that the story was improbable. For the first time in the history of this case, the presence of this water at that point was brought into consideration. There was no evidence of it on the trial before the magistrate. It has been developed here for the first time on this trial by some witnesses who say they saw it. It is not necessary for me to comment on that testimony, because that is a question for the jury as to what weight and credibility they would attach to the testimony of those witnesses. It has never been developed until at this trial. The attention of the prosecuting witness was never, so far as appears on this trial, called to that fact. No evidence that any water was present there when this prosecuting witness came upon the ground is presented. Upon the contrary, the evidence shows that there were parties passing up and down the track that day, and encountering no water; and there is no evidence that at the time the prosecuting witness came on the ground there was any water there, and nothing to put him upon inquiry. That is extreme, and disproves no fact discovered by the witness at the time, as things then appeared.

So that the case, as now developed by the plaintiff, simply shows that no fact was then known to this prosecuting witness which he did not give to his counsel. No fact was known to him which tended, in the mind of a reasonable man, to rebut the presumption or conclusion reached by him of the plaintiff's guilt. What their effect would be upon an issue as to the innocence or guilt of the plaintiff is not a question for the court to determine. But it does not seem to the court that, with such evidence, any reasonable and honest jury could for a moment hesitate to find that the prosecuting witness had grounds, just as the county attorney believed, and just as the committing magistrate found, to believe, from the facts and circumstances before him, that there was reasonable cause. Now, the question is, what tangible fact can go to this jury to justify them in finding a verdict for the plaintiff? Something has been said here in debate as to the possible difference in the rule that obtains in the local state courts and the federal jurisdiction as to the circumstances under which a court will take a case from the jury. There is practically no difference as to the rule. There is perhaps a little more freedom, and a little more independence of action, in one jurisdiction than in the other, in this respect; but the rule is practically the same. The rule as laid down in the supreme court of the United States by Mr. Justice MILLER, in the case of *Pleasants* v. *Fant*, 22 Wall. 116, is as follows:

"In the discharge of this duty, it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor; not whether, on all the evidence, the preponderating weight is in his favor,—that is the business of the

jury; but conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court, after a verdict, to set it aside, and grant a new trial. Must the court go through the idle ceremony, in such a case, of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that, if the jury should find a verdict in favor of plaintiff, that verdict would be set aside, and a new trial had? Such a proposition is absurd; and accordingly we hold the true principle to be that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury. In such case the party can submit to a nonsuit, and try his case again, if he can strengthen it, except where the local law forbids a nonsuit at that stage of the trial; or, if he has done his best, he must abide the judgment of the court, subject to a right of review."

And this rule has been approved by the supreme court of this state in the case of *Powell* v. *Railway Co.*, 76 Mo. 80, in which the court say it is a proper rule that wherever the trial judge feels it would be his duty, under the obligation of his oath and a sense of justice to all parties, to grant a new trial if the jury should return a verdict for the plaintiff, he should take it from the jury. Judge SHERWOOD, in that case, reviewed the authorities, and said:

"Decided cases may be found where it is held that, if there is a *scintilla* of evidence in support of a case, a judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule, to-wit: That, before the evidence is left to the jury, there is or may be in every case a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. So, also, in another case, where the trial court, by an instruction, had taken the case from the jury, and directed a verdict for the defendants, Mr. Justice SWAYNE, delivering the opinion of the court, said: 'It was proper to give the instruction if it were clear the plaintiff could not recover. It would have been idle to proceed further, when such would be the inevitable result. The practice is a wise one. It saves time and costs. It gives the certainty of applied science to the results of judicial investigation. It draws clearly the line which separates the provinces of the judge and jury, and fixes where it belongs the responsibility which should be assumed by the courts.'"

Speaking for myself, I will say that I am always exceedingly loath to interfere with the province of the jury. I have always, since I have been upon the bench, both in the state and in this jurisdiction, tried to keep out of the jury-box; leaving to the jury the determination of all disputable facts,—those from which different conclusions might be reached by men of different minds. At the same time, where the evidence is of such a persuasive and conclusive character, on the one side, that it would be utterly unreasonable or unjust for the jury, either from prejudice or passion, or from misconception of the case, to render a verdict contrary to the whole law and the whole evidence in the case, the court ought to have the courage to perform its duty, and go where the law leads. Demurrer sustained.