The question presented by this appeal is whether the element of probable cause in this action for malicious prosecution was an issue for the jury's consideration. Because we reverse and render, a detailed version of the facts is appropriate.
Plaintiff Robert Hawkins is a resident of Tuscaloosa County. On September 17, 1973, Hawkins went to work for Gulf States Paper Corporation (Gulf States), defendant, as the timber engineering director. He then became the forest engineering director. From 1975 or 1976 to the date of his termination on April 21, 1981, Hawkins was director of Gulf States' Land Engineering Department. His duties generally were to oversee Gulf States' two survey crews and the road- and bridge-building crew. Commencing in 1975 or 1976, the Land Engineering Department began doing external survey and road-building work for parties other than Gulf States, who paid Gulf States for the external work.
From 1976 through May 1981, Gulf States operated on a fiscal year basis, each fiscal year extending from near the end of May of one year until roughly June 1 of the next year. Hawkins had the responsibility of planning the amount of work that his particular operation would do for a given fiscal year, and projecting the amount of money that his department would make from external work during each fiscal year. Hawkins likewise had the duty and responsibility to bill for external work performed by the Land Engineering Department.
From all accounts, Gulf States' policy required that an external customer be billed by invoice, with the Land Engineering Department retaining a file copy and Gulf States' accounting office receiving a copy. External customers were directed to make payment to "cashier Gulf States Paper Corporation," while checks for company debts made payable to Gulf States' employees were to be indorsed and turned over to the cashier with an invoice. Likewise, an employee receiving cash due Gulf States was required to deliver that money as soon as possible to the cashier, with an *Page 383 
invoice or writing to identify it. Hawkins testified that he understood this to be Gulf States' policy and practice.
Prior to June 1979, an external customer, Ed Montgomery, employed Gulf States to do survey work and prepare plats on subdivision lots that he owned. The record indicates that Hawkins talked with Montgomery about this work, and that an agreement was reached whereby Gulf States would be paid $80 for each plat prepared.
On June 18, 1979, Gulf States prepared two plats for Montgomery. On June 20, 1979, the Tuscaloosa law firm of Rosen, Wright, Harwood Albright issued a check for $80 in payment for one plat, and on August 15, 1979, issued a check for $80 in payment for the other plat. These checks were made payable to Robert V. Hawkins and were mailed to him at his home. Hawkins testified that he did not know why the checks were made payable to him personally or mailed to his house. He, however, indorsed these checks and turned them in to Gulf States, with an invoice, sometime in September 1979.
The facts show that between October 18, 1979, and March 25, 1981, a period of approximately a year and a half, twenty-six additional checks were issued, four by Rosen, Wright, Harwood 
Albright, and twenty-two by Tuscaloosa Title Company. Each check was in the amount of $80, and each was payable to Robert V. Hawkins. On April 7, 1981, a twenty-seventh check, in the amount of $110, was issued by Tuscaloosa Title Company, payable to Hawkins. These twenty-seven checks were issued as payment for twenty-seven plats prepared by Gulf States' employees. The first twenty-six checks were for plats for Ed Montgomery, and the twenty-seventh check was for a plat for Richard Montgomery. The four checks issued by the law firm were mailed to Hawkins's home, while the twenty-three checks issued by Tuscaloosa Title Company were sent to his office at Gulf States.
Hawkins testified that he decided to cash the checks and keep the money and use it to meet his external goal. The money was kept inside a daily planner or calender in an unlocked desk drawer at his office. Hawkins stated that as the $20 bills accumulated, he would change them out for $100 bills.
The twenty-seventh, and last, check cashed by Hawkins was issued on April 7, 1981, by Tuscaloosa Title Company, for survey work done for Richard Montgomery. It was made payable to Hawkins in the amount of $110, and was sent to his office. Hawkins cashed the check on the day he left for vacation in North Carolina and carried the money with him, but he testified that he did not spend any of it.
The facts indicate that Hawkins returned to Tuscaloosa on April 19, 1981, and reported for work on April 20, 1981, a Monday. At that time, $2,080 in cash was in his middle desk drawer. He put a $100 bill in and withdrew four $20 bills to pay for some gas. Hawkins testified that he had two or three $100 bills on him when he returned to work on April 20, 1981.
On April 21, 1981, Hawkins returned to work with the intention of putting $90 into the cash fund in his desk; however, he was met at the door by Louis Lombardy, security director of Gulf States. Lombardy took Hawkins upstairs, where John Watkins of the Tuscaloosa Police Department then came in and met with Hawkins alone. Watkins testified that he identified himself as a city detective and that he said that he was investigating irregularities that involved checks from Tuscaloosa Title Company and that he told Hawkins he was suspected of taking money from Gulf States. This meeting between Detective Watkins and Hawkins was precipitated by the following events as they appear from the record.
Joe Mullins, who worked under Hawkins in the Land Engineering Department, noticed that several checks came into the Gulf States office made out to Hawkins. He testified that in December 1980, an envelope from Tuscaloosa Title Company addressed to Hawkins came to the office, and that he could tell there was a check made to Hawkins in the envelope. Mullins stated *Page 384 
that he knew that Gulf States was doing work for Ed Montgomery at that time.
Mullins testified that another envelope addressed to Hawkins arrived in February 1981, and there was a check made to Hawkins in the envelope. Mullins stated that he told Mrs. B.C. Watson, who was the personnel director, that a check made payable to Hawkins had come in. A couple of days later in a telephone conversation with Ed Montgomery, Mullins associated the check received with some work that Gulf States had done for Ed Montgomery. Mullins stated that he checked to see if Gulf States had made an invoice for the Montgomery work, but discovered that there was no invoice in the invoice book. He also checked the number of survey plats against the invoices for the Montgomery work and found a discrepancy in the number of invoices as compared to the number of plats that Gulf States had done.
Mullins testified that he saw another check payable to Hawkins arrive in April after they had done some survey work for Richard Montgomery. He asked Mrs. Watson to check to see if the company received payment for it, and she told him that the company had not received payment. He testified that he then looked through the invoice file and examined the survey plat file and found that there was a discrepancy of twenty-seven to twenty-nine invoices which were not in the invoice file for corresponding plats that were in the survey file.
Mullins said he talked to Mrs. Watson about the discrepancy between the plats and invoices, and next talked to Mr. John Warner, who was executive vice-president of Gulf States. He explained to Warner that he had found a discrepancy in the plats and invoices, that the company did not have invoices to show for work that had been done by company survey crews, and that he had seen a check come in concerning the survey work.
On Thursday, April 16, 1981, Mullins attended a meeting at company headquarters called by Warner. Charles Allison, who was vice-president, secretary, and general counsel of Gulf States, attended the meeting. At the meeting Mullins told the company representatives about the checks and the discrepancies in plats and invoices.
The record indicates that Mullins was excused from the meeting, whereupon Allison asked Paul Hubbard, the company accountant, to go through accounting records to see if he could find any indication that the company had received payment for this series of plat plans for Ed Montgomery. He also asked Louis Lombardy, security director, to go through the drawing records and invoice books to confirm that there was a mismatch between the drawings and the invoices and to look through any other records downstairs to see if he could find any other information that might bear on the question of these plats and payment for them. Allison instructed Lombardy to check Hawkins's work area and desk. The meeting broke up at 6:30 p.m.
Shortly after the meeting, Lombardy went down to Hawkins's office and in Joe Mullins's presence looked in Hawkins's desk drawer. He found a pocket calendar with twenty $100 bills and four $20 bills, $2,080 in cash. Lombardy also looked at some papers that were in the desk and on top of the desk. He checked the invoice book to see if there were any invoices corresponding to the subdivisions that Gulf States had done survey work for, and found there were no invoices corresponding to that survey work. Since Lombardy's investigation occurred about 7 p.m., and he was concerned about leaving the money overnight in an unlocked desk drawer, he took it home.
The facts indicated that on the next day, April 17, Lombardy reported to Jim O'Brien, the company's chief financial officer, and Allison that he had found some cash in Hawkins's desk, and showed them the money. Lombardy also confirmed at that time that there was a series of twenty-nine plats for which there were no matching invoices. Allison instructed Lombardy to return the money to Hawkins's desk.
Likewise, that same morning, Hubbard reported to Allison that he had not found *Page 385 
anything that he could identify as being payment for this series of plats.
Subsequently, Allison called Gerald Hudson at the Tuscaloosa County District Attorney's office. He related to Hudson that Gulf States had discovered some money in Hawkins's desk, that there were some plats that had not been paid for, and that there were some checks issued personally to Hawkins. Allison told Hudson that he was prepared to go to Tuscaloosa Title Company and ask them if they would let him see the checks so that he could determine whether there was any indication on the checks as to whether they had been indorsed and deposited by Gulf States or by someone else.
From the record, it appears that Detective Watkins came to the Gulf States office that afternoon, April 17; met with some of the Gulf States representatives, and went over the information. He met with Allison, Lombardy, and Jim O'Brien. They reviewed with Watkins the same information Allison had discussed that morning with Hudson about plats that were not matched up with invoices; about having seen checks come in from Tuscaloosa Title Company; and about not being able to find any record of their receiving payment for this series of plats.
On Monday evening, April 20, Detective Watkins requested a meeting with Hawkins, which was arranged for the next morning. Watkins also asked that the Gulf States representatives not talk with Hawkins until after he did, and he asked that he be allowed to talk with Hawkins without any of them being present.
Watkins talked to Hawkins about 8 a.m. Hawkins explained to Watkins that he had received checks from Tuscaloosa Title Company that were made out in his name, that he had cashed them and placed the money in his desk drawer, and that the money was to be turned in on May 31, the end of the fiscal year. He stated that there were four checks issued by the Rosen firm and twenty-three checks issued by Tuscaloosa Title Company, as indicated on the survey sheets for Ed Montgomery. Hawkins also told Watkins that none of the checks made out to him had been turned in to Gulf States and that he had planned to turn the money in when he was short on outside income.
The facts show that following his conversation with Hawkins, Watkins talked with Allison. He told Allison that Hawkins admitted cashing the checks and that Hawkins said the following: that he did not intend to steal any money; that he was holding the money to meet his quota, intending to deliver it to the corporation at the end of the fiscal year; that he had the money in his desk drawer.
After Allison talked to Watkins, Allison called Assistant District Attorney Hudson. He related to Hudson the additional information that Watkins had uncovered about the checks being cashed, about Hawkins's admitting cashing the checks, and about Hawkins's telling Watkins the money was in the drawer. He asked Hudson whether the money being in the desk drawer made any difference to the case. Hudson either read or quoted to Allison a portion of the statute relevant to the matter which indicated that withholding money under such circumstances that the owner would be deprived of the use of it would constitute criminal conduct. Hudson indicated that upon completion of the investigation by Watkins, he would ask Gulf States to sign a warrant.
The record shows that following a conversation between Hawkins and Allison in the presence of other Gulf States representatives, in which Hawkins gave the same details as he had related previously to Detective Watkins, Hawkins's employment with Gulf States was terminated. During this meeting, he apparently neither mentioned the $90 that he had in his pocket that belonged to Gulf States, nor later returned it to the company. The money which had been in Hawkins's desk drawer was, however, turned over to the company. It was then placed in an envelope and sealed.
From the record, it appears that before signing the warrant, Lombardy had some conversations with Detective Watkins, who *Page 386 
was actively investigating the case. From those conversations, Lombardy learned that there were twenty-seven plats for which Gulf States had done the work that had not been invoiced; that the checks for these plats had been made out to Hawkins for the amount of $2,190, and that Hawkins had subsequently cashed the checks. Watkins's first questions was whether Gulf States would be willing to prosecute Hawkins if a crime was involved, and representatives of Gulf States responded that they would cooperate with the authorities if there was a crime involved. Watkins and Lombardy had also discussed the fact that it appeared that there was probable cause to believe a crime had been committed. The issue of probable cause was also discussed with Allison.
When Detective Watkins informed Lombardy that he was ready to have a warrant signed, Lombardy called Allison, who authorized Lombardy to sign the warrant.
Hawkins was subsequently arrested for theft of property in the first degree. A preliminary hearing was conducted on June 8, 1981, before then-District Judge Karrh, who made a finding that there was probable cause to believe that an offense had been committed and that Hawkins had committed it, and bound Hawkins over to the grand jury.
The case was presented to the grand jury and a "no bill" was rendered in the case. The case was returned to the grand jury and additional evidence presented. A second "no bill" was returned in the case by the grand jury.
Hawkins filed suit against Gulf States to recover his last month's salary, which the company had refused to pay. The complaint was later amended to include, in addition to the count for money owed, a count of malicious prosecution and a count of slander. The complaint was again amended to allege that the grand jury had for a second time returned a "no bill" as to the charges against Hawkins.
During the trial of the case, Gulf States amended its answer so as to admit that it owed Hawkins $2,135.64. On motion of Gulf States, a directed verdict was granted by the trial court in favor of Hawkins on count one. The slander count (count three) was dismissed by Hawkins, and the trial proceeded as to count two, malicious prosecution. At the close of all the evidence, Gulf States moved for a directed verdict, which was denied by the trial court. The jury returned a verdict in favor of Hawkins and against Gulf States in the amount of $200,000. Gulf States then filed a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. This motion was denied by the trial court, whereupon Gulf States appealed.
 I
A directed verdict or judgment notwithstanding the verdict is governed by the scintilla rule. Rule 50 (e), Ala.R.Civ.P. We have emphasized that:
 "`* * * it is only where the facts are such that all reasonable men must draw the same conclusion from them that the question . . . is ever considered as one of law for the court. Unless the evidence is free from doubt or adverse inference, the question is for the jury. Alabama Power Co. v. Guy, 281 Ala. 583, 206 So.2d 594. Where the affirmative charge [now directed verdict] is requested, the entire evidence must be viewed in a light favorable to the opponent. When a reasonable inference may be drawn, which is adverse to the party requesting the charge, the charge is properly refused. (Citations omitted)' (Emphasis supplied [in Alabama Power Co. v. Taylor, 293 Ala. 484, 306 So.2d 236].)
"* * *
 "`In civil cases, a question must go to the jury, if the evidence, or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint. (Citations omitted. * * *' Kilcrease v. Harris, 288 Ala. 245, 259 So.2d 797 (1972).
 "A defendant as well as a plaintiff is entitled to the benefit of the scintilla *Page 387 
rule. McHugh v. Harrison, 266 Ala. 138, 94 So.2d 756
(1957)."
Turner v. Peoples Bank of Pell City, 378 So.2d 706, 709 (Ala. 1979) (quoting Alabama Power Company v. Taylor, 293 Ala. 484,492, 306 So.2d 236, 243 (1975)).
The standard for testing a motion for judgment notwithstanding the verdict is identical to that for testing a motion for directed verdict. Casey v. Jones, 410 So.2d 5, 8 (Ala. 1981). Consequently, our review of the trial court's failure to grant Gulf States' motion for directed verdict at the close of the evidence or its motion for a judgment notwithstanding the jury's verdict is guided by these principles.
 II
The essential elements of a cause of action for malicious prosecution are well known: (1) a judicial proceeding initiated by the defendant; (2) the lack of probable cause; (3) malice on the part of the defendant; (4) termination of the judicial proceedings favorably to the plaintiff; and (5) damages. AlabamaPower Co. v. Neighbors, 402 So.2d 958 (Ala. 1981); S.S. KresgeCo. v. Ruby, 348 So.2d 484 (Ala. 1977); Birwood Paper Co. v.Damsky, 285 Ala. 127, 229 So.2d 514 (1969); Hanchey v. Brunson,175 Ala. 236, 56 So. 971 (1911). In order for the plaintiff to prevail, every one of these elements must be proved. AlabamaPower Co. v. Neighbors, supra, 402 So.2d at 962. The element of probable cause is the focus of this appeal.
In the action below, the trial court ruled that the presumption of probable cause created by the district court's binding Hawkins over for the grand jury, on the one hand, and the presumption of a lack of probable cause resulting from the "no bill" action of the grand jury, on the other, cancelled one another so as to make the issue of probable cause a disputed issue and thus a question for the jury to resolve. The portion of the trial court's order discussing the authorities supporting the cancellation theory is included below.
 "Miller v. Chicago, M. St. P. Ry. Co., 41 F. 898 (Cir.Ct., W.D.Mo. 1890), is factually similar [to this case]. In that case the court was faced with the same adverse actions of two regularly constituted judicial bodies. The court held that where there was such an even balance of presumptions, they counterbalanced each other and it devolved upon the plaintiff to carry the burden of proving want of probable cause. Id., at 902, 905.
 "In Lindsey v. Couch, [22 Okla. 4] 98 P.[2d] 973
(Okla. 1908), the facts were reversed. The magistrate had discharged the accused and the grand jury had subsequently indicted. The court held that the conflicting presumptions cancelled each other, and that nothing was proven thereby on the issue of probable cause. Id., at 976-977.
 "Although not directly addressing the point, several other factually similar cases either recognize the possibility of the rule, or fail to reject the rule. See, e.g., Mitchem v. National Weaving Co., 210 N.C. 732, 188 S.E. 329, 330 (1936); Jones v. Wilmington W.R. Co., [131 N.C. 133] 42 S.E. 559 (N.C. 1902); Wells v. Parker, [76 Ark. 41] 88 S.W. 602 (Ark. 1905); Cunningham v. Mareno, [9 Ariz. 300] 80 P. 327 (Ariz. 1905); Brady v. Stilner, [40 W. Va. 289], 21 S.E. 729 (W.V. 1895).
 "Apparently contra is Drake v. Anderson, [215 Or. 291] 334 P.2d 477 (Ore. 1959). In Drake, the accused was bound over, and the action was no billed. The court held those facts established `only a prima facie case of probable cause,' as opposed to a conclusive presumption. Id., at 479. The court does not specifically address the cancellation theory. Drake is a case affirming a plaintiff's verdict on a defendant's appeal, and the cancellation theory apparently was not advanced by either party.
 "On the authorities cited, the court concludes that the majority rule is that where two separate judicial bodies have reached opposite results on the probable cause issue, the resulting, conflicting presumptions cancel each other, and the burden of establishing [want of] probable *Page 388 
cause devolves upon the plaintiff. The Drake case, which is more favorable to the defendant, does not directly discuss the cancellation theory. The court adopts and applies the majority rule to this case.
 "The fact that the district court found probable cause and bound plaintiff over, [and the fact that] the grand jury subsequently entered two no bills cancel each other on the question of prima facie presumptions, and the plaintiff thus has the burden of proving want of probable cause on the part of the defendant. See Hanchey v. Brunson, supra, [175 Ala. 236, 56 So. 971], at 972; Alabama Power Co. v. Neighbors, supra, [402 So.2d 958], at 962."
The trial court is correct in holding that the burden of proving that probable cause did not exist was, regardless of the cancellation theory, still upon the plaintiff, Hawkins; and it was Hawkins's burden to prove that it did not exist at the time the prosecution was instituted by Gulf States. Hanson v. Couch,360 So.2d 942 (Ala. 1978); S.S. Kresge Co. v. Ruby, supra;Piggly-Wiggly Alabama Co. v. Rickles, 212 Ala. 585, 103 So. 860
(1925); Hanchey v. Brunson, supra; Gulsby v. Louisville N.R.R.Co., 167 Ala. 122, 52 So. 392 (1910). We need not embrace the concept of the cancellation theory as creating a jury issue in this case, and thereby precluding a directed verdict on the question of probable cause, because we find the material facts as they relate to the issue of probable cause are uncontroverted. In fact, in cases where the only action has been a grand jury "no bill," such is prima facie evidence only and the effect of its introduction is to shift the burden of proof to the defendant, thus requiring him to come forward with evidence that probable cause existed. See Stouts Mountain Coal Co. v. Grubb, 217 Ala. 274,275, 116 So. 156, 157 (1928). While such prima facie showings or presumptions are rebuttable, their purpose is to shift the burden of proof and not to create inferences of fact.
 III
"`Probable cause' as the term is employed in actions for malicious prosecution, is such a state of facts in a mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person is guilty." Birwood Paper Co. v. Damsky, supra,285 Ala. at 134, 229 So.2d at 521; Hanchey v. Brunson, supra,175 Ala. at 240, 56 So. at 972. As the Court explained in Gulsby v.Louisville N.R.R. Co., supra:
 "Whether the plaintiff was in fact guilty of the offense is not a controlling inquiry on this issue. — McLeod v. McLeod, [75 Ala. 483 (1883)]. The question is, Were the known (to the prosecution) facts and circumstances sufficient, regardless of the unfavorable (to the state) event of the prosecution, to justify a reasonable and cautious man in believing the plaintiff guilty? The consequence necessarily is that a want of knowledge of sufficient evidence to convict the accused of the offense charged is not the test of probable cause vel non. And it is necessarily a corollary that the facts and circumstances known to the prosecution, and on which, under the doctrine of probable cause, he was authorized to act, need not be legally admissible evidence on the trial of the accused.
 "Between the evident policy of the law to bring the guilty to justice, which is usually begun by steps taken by the citizen, and, on the other hand, the right of the other citizen to be free from the accusation of crime without probable cause therefor, the law must hold an even hand, never so exaggerating the latter protective right as to render the exercise of the means afforded for the detection and punishment of crime against the state an act of peril and penalty to the citizen who, in good faith and with probable cause therefor, starts the machinery of the penal law against the accused. Neither right nor policy, of the two mentioned, is superior in the eyes of the law. Ignoring one is as grave in consequence as ignoring the *Page 389 
other. Both must be fairly considered, when occasion arises, to determine such issues as are here presented."
167 Ala. at 130, 52 So. at 395 (emphasis in original). Hence, the question becomes one of whether or not the defendant acted in good faith on the appearance of things. See Birwood v. Damsky,supra, 285 Ala. at 135, 229 So.2d at 521.
The warrant issued for Hawkins's arrest charged theft of property in the first degree. It was based on the affidavit of Louis Lombardy, security director of Gulf States, and authorized by Charles Allison, general counsel of Gulf States. Lombardy's affidavit, in pertinent part, read:
 "Robert V. Hawkins . . . within twelve months before [the] making [of] this affidavit . . . did knowingly obtain or exert unauthorized control over 27 checks, the property of Gulf States Paper Corp., of the value of $2,190, with the intent to deprive the owner of said property, in violation of 13A-8-3
of the Code of Alabama. . . ."
It is a violation of Code 1975, § 13A-8-3, for a person to knowingly obtain or exert unauthorized control over the property of another, with the intent to withhold the property from the owner for such a period or under such circumstances that all or a portion of its use or benefit would be lost to the owner. Section 13A-8-3 provides:
 "(a) The theft of property which exceeds $1,000 in value, or property of any value taken from the person of another, constitutes theft of property in the first degree.
 "(b) The theft of a motor vehicle, regardless of its value, constitutes theft of property in the first degree.
 "(c) Theft of property in the first degree is a Class B felony."
"Theft of property" is defined in § 13A-8-2 as follows:
 "A person commits the crime of theft of property if he:
 (1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property; or
 (2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property."
The term "deprive," as it relates to a criminal offense involving theft, is defined by § 13A-8-1 (2)a. to mean:
 "To withhold property or cause it to be withheld from a person permanently or for such period or under such circumstances that all or a portion of its use or benefit would be lost to him. . . ."
As they appear from the record, Hawkins's actions lead the Court to the conclusion that they furnished prima facie evidence of guilt which was sufficient to furnish probable cause for commencing a prosecution for theft of property. See Elliott v.Caheen Bros., 228 Ala. 432, 434, 153 So. 613, 614 (1934). The uncontroverted facts show that Hawkins cashed twenty-seven checks which belonged to Gulf States; that Hawkins kept the money from the cashed checks in his desk drawer without company authorization for some eighteen months, thereby depriving Gulf States of the use of the money and interest on the funds; and that he violated the company's policy by keeping the money and not turning it in to the company cashier. Although Hawkins denied an intent to permanently take the funds, he specifically admitted that he deprived Gulf States of the use of its funds by virtue of his unauthorized control of them.
In Hawkins's brief, the following statements are made:
 "No one except one who wanted to believe it, would have ever thought that Bob Hawkins was stealing. Checks were made payable by third parties, for work done by [Gulf States] to Bob Hawkins and mailed to him at his office at the [Gulf States] headquarters. Hawkins then cashed the checks and kept the money in an unlocked desk drawer. He did this within the sight of other employees — indeed, he did it in virtually plain view.
 "When confronted with the fact that the money had been found, Hawkins *Page 390 
readily described the entire story for anyone who asked. The story he told in court is the same one he told Sgt. Watkins and the [Gulf States] executives."
Hawkins's denial and explanation of his actions to Gulf States officials, however, did not present a jury question on the issue of probable cause. From the facts appearing in the record, the Court concludes that Gulf States was acting as "a cautious man" would act in believing at the time the warrant was signed that Hawkins had committed the crime of theft. Likewise, the Court finds that the question of probable cause was not one of fact for the jury. Indeed, Hawkins admitted that he accepted checks which were company property and was without authority to cash them and hold the money until such time as it was needed to help him meet his income projections for the land department. When the facts as they relate to the issue of probable cause are undisputed, as they are here, the question of whether the facts constitute probable cause is one of law for the court and not an issue for the jury to decide. Hanson v. Couch, supra, 360 So.2d at 945;S.S. Kresge Co. v. Ruby, supra, 348 So.2d at 488; Key v. Dozier,252 Ala. 631, 634, 42 So.2d 254, 256 (1949).
Consequently, since the evidence was undisputed as to probable cause, the trial court erred by not entering a directed verdict at the close of the evidence or granting the motion for a judgment notwithstanding the verdict following the jury's verdict.
REVERSED AND RENDERED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.