THOMPSON, Presiding Judge.
 

 Anthony Rogers appeals from a summary judgment entered by the Montgomery Circuit Court in favor of Penske Truck Leasing Co., L.P. (“Penske”), and Terry Wallace in Rogers’s malicious-prosecution action. For the reasons stated herein, we affirm that judgment.
 

 The record discloses the following facts that are relevant to this appeal. In keeping with our standard of review discussed herein, we present these facts in the light most favorable to Rogers. Penske is a nationwide company that, among other things, leases vehicles ranging from tractor-trailers to vans. Penske’s leases are generally long-term agreements with private companies that provide for Penske to service and maintain the leased vehicles. Penske provides maintenance and fuel services for its leased vehicles at many of its facilities, including one in Montgomery (“the Montgomery facility”).
 

 Rogers began working at the Montgomery facility in April 1997, when it was owned by a predecessor-in-interest to Penske. When Penske bought that com
 
 *782
 
 pany and acquired the Montgomery facility, Penske continued Rogers’s employment. Penske gave Rogers the title “customer service representative,” or “CSR”; his primary job was to dispense fuel to Penske’s customers when they brought, their leased vehicles into the facility.
 

 The Montgomery facility was open from 6:00 a.m. to 11:00 p.m., Monday through Saturday, and was closed on Sunday. The Montgomery facility consisted of an office, a maintenance shop, two fuel lanes separated by an island on which a booth was located, a washing area, and a parking lot. The Montgomery facility was surrounded by a fence with two gates that remained open during business hours but that were closed and locked after hours. The gates could be unlocked by use of a code that was known by all Penske’s employees and by its customers that parked their vehicles in Penske’s parking lot. The office was locked at night, but the booth located in the island between the fueling lanes remained unlocked at all times because a key was broken off in its lock. CSRs at the Montgomery facility worked in one of three shifts: morning (6:00 a.m. to 2:30 p.m.), midday (10:00 a.m. to 6:30 p.m.), or night (3:00 p.m. to 11:30 p.m.). Rogers almost always worked the morning shift, usually arriving early. At all times relevant to this action, Jim Lager served as Penske’s manager for the district encompassing, among others, the Montgomery facility; Jay Katz served as the manager of the Montgomery facility; and defendant Terry Wallace served under Katz as the service manager of the Montgomery facility-
 

 At the Montgomery facility, fuel was dispensed by a CSR who was stationed at the booth on the island separating the fueling lanes. Inside the booth was a computer that recorded information regarding fuel dispensing (“the fueling computer”). Electricity to the booth was controlled in the office and was turned on every morning between 5:30 a.m. and 6:00 a.m.; it was turned off every night between 11:00 p.m. and 11:30 p.m. Without electricity to the booth, the fueling computer would not function and fuel could not be dispensed. In addition, the fuel dispensers were locked with a padlock every night at closing. Fuel could not be dispensed until the dispensers were unlocked. Rogers did not have a key to the office or to the padlocks on the dispensers; thus, he could not begin dispensing fuel to Penske’s customers until Harry Deaton, a Penske employee, arrived and unlocked the office, turned on the electricity to the booth, and unlocked the padlocks on the fuel dispensers.
 

 The CSR who turned on the fueling computer each morning logged his or her personal four-digit code into the computer. By doing so, the computer would keep track of which CSR was dispensing fuel throughout the day. A CSR’s personal four-digit code would remain logged into the computer until it was automatically logged out from nonuse, until the CSR manually logged out of the computer, or until a different personal four-digit code was entered into the computer.
 

 Every vehicle that Penske leased to its customers had a six- or seven-digit unit number; generally, though not in every case, the unit number was affixed to the left side of the vehicle. Before fuel could be dispensed to a particular vehicle, the CSR was required to enter the unit number of the vehicle into the fueling computer along with the mileage of the vehicle. After a vehicle was fueled, the fueling computer printed two identical receipts. One receipt was for the driver, and the other was for Penske. The receipt contained, among other things, the following information: a transaction number, the date on
 
 *783
 
 which the fuel was dispensed, the time at which the fuel was dispensed, the name of the Penske customer for whom the fuel was dispensed, the unit number of the vehicle, the mileage of the vehicle, the amount of fuel dispensed, and the initials of the CSR whose personal four-digit code was logged into the fueling computer at the time the fuel was dispensed.
 

 The driver of the fueled vehicle was not required to take his or her copy of the receipt, and, when he or she did not, the CSR threw the driver’s receipt in the trash. The CSR placed Penske’s copy of the receipt in a black box located in the booth. Once per day, a CSR took the receipts from the black box into the office. During one period, the receipts from the previous day were taken to the office first thing in the morning. However, after the receipts from the previous day could not be located on a couple of occasions, Wallace instructed the CSR on duty at the end of the day to take the receipts from the black box into the office.
 

 Using the information contained in the fueling computer, Penske generated periodic invoices for its customers requesting payment for the fuel it dispensed to them.
 

 At all times relevant to this action, a company known in the record as “Buffalo Rock” had a contract with Penske under which it leased approximately 30 vehicles from Penske and obtained fueling services and maintenance from Penske at the Montgomery facility. Buffalo Rock’s distribution center was located within a mile of the Montgomery facility. The vehicles that Buffalo Rock leased from Penske left Buffalo Rock’s distribution center before 6:00 a.m.; those in need of fuel stopped at Penske’s Montgomery facility and waited for the facility to open. As soon as Deaton turned on the electricity to the booth and unlocked the fuel dispensers, Rogers began fueling the Buffalo Rock vehicles. At that time of the day, there was generally a line of 12 to 15 Buffalo Rock vehicles waiting to be fueled. Buffalo Rock drivers generally did not take their copies of the receipts generated by the fueling computer; CSRs would throw the Buffalo Rock drivers’ copies into the trash or into a cardboard box located in the booth. Wallace knew of this practice. At all times relevant to this action, Penske allowed drivers who were having their vehicles fueled to leave their vehicles and walk around the facility, including inside the booth.
 

 It is undisputed that, beginning in 2004 or 2005, Christopher Bibb began stealing fuel from Penske. Bibb, who was not a customer of Penske, drove a large blue truck and would obtain fuel by using unit numbers that he wrote on a piece of cardboard and taped to the side of his truck. The record includes testimony indicating that Bibb obtained fuel from Penske on several occasions during the evening shift. Two CSRs were reprimanded for fueling Bibb’s truck.
 

 Sometime between 3:00 p.m. on Sunday, August 8, 2005, and 5:30 a.m. the next day, someone stole 23 tires and a tool from the maintenance shop at the Montgomery facility. An investigation conducted by William Megary, Penske’s internal investigator, failed to determine whether a Penske employee had any involvement in that theft.
 

 Following the theft, at a regular monthly safety meeting involving Katz, Wallace, and all the CSRs and technicians employed at the Montgomery facility, it was discussed that a blue truck was coming into the facility and improperly obtaining fuel. Several of the individuals present stated that they knew where the truck parked at night. At some point after the meeting, Wallace gave Rogers a memorandum to post in the booth instructing the CSRs not
 
 *784
 
 to fuel, among others, trucks for “Bibb Trucking.”
 

 On October 18, 2005, Bibb drove his truck into the Montgomery facility to obtain fuel. Because there were no CSRs on duty, James Crum, a mechanic at the Montgomery facility, approached Bibb’s truck to fuel it. Bibb handed Crum a piece of paper with a unit number and mileage written on it. Crum input these numbers into the fueling computer and began fueling Bibb’s truck. The fuel pump automatically shut off after dispensing approximately 90 gallons of fuel. Because a truck the size of Bibb’s normally held substantially more fuel than that, Crum decided to review the information displayed on the fueling computer about the truck corresponding with the unit number Crum had entered into it. The fueling computer indicated that the vehicle that corresponded with the unit number that Bibb had given to Crum was a type of truck substantially different from the one Bibb was driving and that a company known as Victory Packaging had leased the truck assigned that unit number from a Penske facility located in Dallas, Texas. Crum noted that on the side of Bibb’s truck was taped a piece of cardboard with the name “Victory Packaging” handwritten on the cardboard.
 

 Crum contacted Wallace, who was not at the facility, by using a two-way radio and informed him of the discrepancy between the unit number Bibb had given him and the type of truck assigned that number. Wallace instructed Crum to contact the police. Bibb, apparently overhearing Crum’s conversation with Wallace, drove off with the fuel nozzle still in his truck, breaking the fuel pump. As instructed, Crum contacted the Montgomery Police Department (“the MPD”). An officer from the MPD arrived at the Montgomery facility at about the same time as Wallace. Crum gave Wallace the receipt generated by the fueling computer for the 90 gallons dispensed to Bibb’s truck, as well as the tag number of Bibb’s truck. The officer interviewed Crum about the incident; Wallace did not take part in that interview. The officer filled out an “Alabama Uniform Incident/Offense Report” in which he indicated that “[tjhere was no evidence and the complainant stated he would prosecute.” The report did not indicate whether Wallace turned over the receipt and the license-plate number to the officer.
 

 In late October 2005, Wallace and another Penske employee were traveling in northeast Montgomery and saw a truck in a warehouse that matched the description of Bibb’s truck. Wallace and the other employee returned to the Montgomery facility, gathered the paperwork Wallace had retained from the October 18, 2005, incident, and returned with Crum to the warehouse where the truck was located. Crum positively identified the truck as the one involved in the October 18, 2005, incident. He noted that the piece of cardboard that had been taped to the side of the truck had been removed but that residue from the tape was still on the truck. Painted on the side of the vehicle, and no longer obscured by the cardboard sign, was the name “Bibb Trucking.” Wallace positively identified eight of the tires on the truck as having been among the 23 tires stolen from the Montgomery facility. Wallace contacted the police. Two officers from the MPD came to the warehouse, and, upon Crum’s positive identification of the truck, impounded it.
 

 One or two days later, Bibb contacted the MPD, spoke with Detective Scott Thompkins, and inquired as to why his truck had been impounded. After learning from his supervisor the reason the truck had been impounded, Detective Thompkins contacted Wallace and requested that Wal
 
 *785
 
 lace meet him to identify the tires on the truck as having been stolen from Penske. Wallace agreed to do so. Later that day, Wallace met Detective Thompkins at the location where Bibb’s truck was impounded and positively identified the tires on the truck as those belonging to Penske. He also indicated to Detective Thompkins that Bibb’s truck had a Penske sticker on it that had been illegally obtained and that the truck had been fueled at the Montgomery facility on October 18, 2005, using a Penske vehicle unit number. Later, Detective Thompkins conducted a photographic lineup at which Crum identified Bibb as the driver of the truck during the October 18, 2005, incident.
 

 On the morning of October 28, 2005, Bibb met with Detective Thompkins' at the MPD headquarters. When Detective Thompkins questioned Bibb about the tires, Bibb claimed that he had purchased the tires from someone and produced a receipt for them. He later admitted that he had created the receipt himself. Bibb consented to a search of his truck. Detective Thompkins and another ofGcer with the MPD conducted the search. During the search, they found 15 receipts for fuel purchased at Penske’s Montgomery facility in an overhead glove compartment. Fourteen of the receipts were for fuel allegedly purchased between June 7, 2004, and March 11, 2005, for use in 11 different vehicles leased by Penske to Buffalo Rock. The 15th receipt was for fuel allegedly purchased on August 3, 2004, for use in a vehicle leased by a company known as Big Lots. The receipts indicated that all 15 transactions they referenced occurred between 5:36 a.m. and 6:34 a.m., and each one listed the initials “AR” on the line indicating the Penske employee who serviced the vehicles at the time of the transactions. Bibb denied knowing anything about the receipts.
 

 After finding the receipts, Detective Thompkins contacted Wallace about them and asked Wallace to meet him to “decipher” them. Detective Thompkins thereafter prepared an incident/offense report in which, among other things, he listed Wallace as reporting that Bibb had stolen fuel from Penske. Detective Thompkins then obtained a warrant for Bibb’s arrest for theft of the tires and the fuel, and he arrested Bibb.
 

 Detective Thompkins testified that he later met with Wallace and Katz, asking them about the information contained on the receipts, and, particularly, who the initials “AR” referenced. Wallace informed Detective Thompkins that “AR” stood for Anthony Rogers, the only Penske employee with those initials, and that “serviced by” next to the initials indicated that Rogers had dispensed the fuel represented by the receipts. Detective Thompkins asked Wallace and Katz to obtain “back-up” information “that would correspond to the fuel tickets.”
 

 On October 31, 2005, Detective Thomp-kins and another officer went to the Montgomery facility and asked Katz if they could question Rogers. Katz said they could, and the officers took Rogers to the MPD headquarters for questioning. During the questioning, Rogers indicated that he had dispensed the fuel referenced in the 15 fueling receipts found in Bibb’s truck but that he had dispensed it into the vehicles referenced in the receipts, not into Bibb’s truck. Rogers indicated that he did not know Bibb, that he had never seen Bibb’s truck at the Montgomery facility, and that he had never dispensed fuel to Bibb’s truck. When asked why the 15 receipts were found in Bibb’s truck, Rogers responded that they would have to ask Bibb. He also stated that Bibb could have picked up the 15 receipts off the ground or out of the trash.
 

 
 *786
 
 Following his questioning of Rogers, Detective Thompkins obtained a warrant for Rogers’s arrest for theft of property in the first degree for stealing 1,251 gallons of fuel. Detective Thompkins’s investigative report indicated that he had obtained the arrest warrant “on behalf of Penske Truck Leasing.”
 

 On the same morning that Rogers was arrested, Wallace generated fueling reports that he later gave to Detective Thompkins. Those reports showed the cost of the dispensed fuel represented by the 15 receipts, the fact that all of that fuel was dispensed between 5:36 a.m. and 6:34 a.m., and the fact that the cost of the fuel had been billed to Buffalo Rock and Big Lots. Wallace could have, but did not, provide a report to Detective Thompkins that detailed the fueling history of each of the 12 vehicles listed in the 15 receipts. Such a report would have shown all the dates on which fuel was dispensed to those vehicles, the location at which the fuel was dispensed, the mileage entered by the CSR at the time of fueling, and the amount of fuel dispensed.
 

 At some point during his investigation, Detective Thompkins asked Wallace and Katz to inquire if Buffalo Rock had records indicating whether the trucks it was leasing from Penske had received the fuel referenced in the receipts recovered from Bibb’s truck. When asked about this request during these proceedings, Detective Thompkins said that he could not recall whether Wallace and Katz had spoken with Buffalo Rock as he had requested. In their respective depositions, Wallace- and Katz denied that Detective Thompkins had ever asked them to make such a request of Buffalo Rock, and they testified that they had not made such a request of Buffalo Rock.
 

 On the same day he was arrested, Rogers posted a bond for his release. He contacted Wallace and denied that he had stolen fuel from Penske. Either during that telephone call or in a subsequent telephone call, Wallace informed Rogers that Penske was terminating his employment.
 

 After Rogers had been arrested and released on bond, William Megary, Penske’s internal investigator who had investigated the theft of the tires earlier in 2005, conducted an investigation of the fuel theft. Megary prepared a memorandum for Lager and Katz, which was dated November 2, 2005, regarding his findings. Among other things, Megary indicated his belief that, based on the known facts at that time, there was sufficient cause to terminate Rogers’s employment. He wrote that, if Lager and Katz thought that there was insufficient information to support termination, then Rogers should be placed on paid leave pending the results of further investigation.
 

 On November 2, 2005, Rogers applied for unemployment compensation. Penske objected to Rogers’s application for benefits on the ground that it had discharged him for theft. On November 22, 2005, an examiner with the Alabama Department of Industrial Relations (“DIR”) awarded Rogers unemployment-compensation benefits, stating that Penske had failed to provide sufficient evidence of misconduct on the part of Rogers. Penske appealed the examiner’s determination. On December 22, 2005, a hearing officer with DIR held a hearing on Penske’s appeal. During the hearing, Katz testified that Wallace had authorized the filing of criminal charges against Rogers. The hearing officer upheld the examiner’s decision.
 

 On January 17, 2006, the Montgomery County District Attorney presented the evidence against Bibb to a grand jury. The grand jury returned indictments against Bibb alleging his theft of the fuel and receipt of stolen tires. Though the
 
 *787
 
 record does not reflect when she .did so, the district attorney also presented evidence to a grand jury regarding Rogers’s alleged involvement with the fuel theft. The grand jury did not indict Rogers.
 

 At a preliminary hearing on January 27, 2006, a deputy district attorney indicated that the charges against Rogers would be nolle prossed. On February 6, 2006, the district attorney moved to nolle prosequi the criminal case against Rogers, indicating in her motion that the district court had lost jurisdiction over the case. The court granted the district attorney’s motion on February 15, 2006.
 

 Rogers filed the present action on February 8, 2006, naming Penske and Wallace as defendants. He alleged that their actions amounted to malicious prosecution.
 
 [1]
 

 On February 22, 2006, Bibb pleaded guilty to the charges against him. During Bibb’s sentencing, Bibb’s attorney indicated that Bibb had agreed to testify against Rogers.
 

 On January 16, 2007, Penske and Wallace filed a motion for a summary judgment. They argued that Rogers’s claim of malicious prosecution failed because there was not substantial evidence supporting several of the elements of that claim. They pointed out that, to succeed on a malicious-prosecution claim, a plaintiff must present evidence indicating that the defendant initiated a prior judicial proceeding against the plaintiff, that there was no probable cause to institute the prior proceeding, that the defendant acted with malice in instituting the prior proceeding, that the prior proceeding terminated favorably to the plaintiff, and that the plaintiff was damaged. They argued that they did not initiate Rogers’s prosecution; that, even if they did initiate the prosecution, there was probable cause to do so; and that there was no evidence indicating that they had acted with malice toward Rogers.
 

 In January 2007, the district attorney presented the evidence against Rogers to another grand jury. Unlike the previous grand-jury proceeding, Bibb testified at this proceeding. On January 26, 2007, the grand jury indicted Rogers for the theft of the fuel. On March 9, 2007, the parties filed a joint motion to stay Rogers’s action pending the resolution of the criminal proceedings against him. On March 18, 2007, the trial court granted the motion and stayed Rogers’s action. In June 2007, Rogers was tried for, and was acquitted of, the theft of the fuel.
 

 On August 10, 2007, Penske and Wallace filed a renewed motion for a summary judgment. They argued that witness testimony at Rogers’s criminal trial provided additional evidence indicating that they did not institute criminal proceedings against Rogers but that those proceedings were initiated by the MPD. They also contended that Rogers’s indictment by the grand jury was prima facie evidence of probable cause and that, in addition to the indictment, testimony at the criminal trial provided further evidence of probable cause.
 

 On October 15, 2007, Rogers filed a response to Penske and Wallace’s motion for a summary judgment. He argued that substantial evidence supported every element of his malicious-prosecution claim. Specifically with regard to Penske and Wallace’s argument that they did not initiate the criminal proceeding against him, Rogers pointed out, among other things,
 
 *788
 
 that Detective Thompkins had indicated in his report that he had signed the warrant and affidavit charging Rogers with theft on Penske’s behalf and that, according to Katz, Wallace had authorized the filing of criminal charges against Rogers. Rogers also argued that Penske and Wallace had withheld information and documents from the police that could have had a material effect on the investigation. As to Penske and Wallace’s argument that, even if they did initiate the criminal proceeding against Rogers, there was probable cause to do so, Rogers contended that, when the evidence in dispute was considered in the light most favorable to him, a jury could conclude that, given what Wallace and his superiors at Penske knew about the situation, there was an absence of probable cause to initiate the criminal proceeding against him. In this regard, he responded to Penske and Wallace’s supplemental summary-judgment argument that Rogers’s indictment was prima facie evidence of probable cause by noting that it was Bibb’s testimony that caused the second grand jury to indict Rogers in January 2007, and, at the time the criminal proceedings were initiated in late 2005, Bibb had not yet implicated Rogers in the theft of the fuel. Finally, as to Penske and Wallace’s argument that there was not substantial evidence indicating that they had acted with malice, Rogers argued that malice could be inferred from the lack of probable cause to initiate the criminal proceeding against him.
 

 After the trial court held a hearing on Penske and Wallace’s summary-judgment motion and each party filed additional briefs, the trial court, in an order entered on March 28, 2008, granted Penske and Wallace’s motion and entered a summary judgment in their favor. In its order, the trial court wrote, in pertinent part:
 

 “The undisputed facts show that Bibb stole fuel from Penske. He almost certainly had assistance from a Penske employee. Bibb was prosecuted, pleaded guilty, and named [Rogers] as his co-conspirator. After an unsuccessful attempt to indict [Rogers], he was indicted for theft. He was acquitted.
 

 “Given these undisputed facts, the Court finds that, as a matter of law, probable cause existed for the prosecution of [Rogers].”
 

 Rogers appealed the trial court’s summary judgment to the supreme court, which transferred his appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 We begin our analysis by recognizing the standard by which we review a trial court’s summary judgment:
 

 “We review this case
 
 de novo,
 
 applying the oft-stated principles governing appellate review of a trial court’s grant or denial of a summary-judgment motion:
 

 “ ‘We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the non-movant to present substantial evidence creating a genuine issue of material fact. “Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.’ ”
 

 American Liberty Ins. Co. v. AmSouth Bank,
 
 825 So.2d 786, 790 (Ala.2002) (quot-
 
 *789
 
 mg
 
 Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C.,
 
 792 So.2d 869, 372 (Ala.2000)). In reviewing a trial court’s judgment, we are not limited by the reasoning the trial court applied in reaching its judgment. Instead, we can affirm a trial court’s judgment if it was correct for any valid legal reason.
 
 See Brannan v. Smith,
 
 784 So.2d 293, 297 (Ala.2000).
 
 [2]
 

 The law does not favor malicious-prosecution actions.
 
 Eidson v. Olin Corp.,
 
 527 So.2d 1283, 1284 (Ala.1988). The reason for this disfavor is that “ ‘[p]ublic policy requires that all persons shall resort freely to the courts for redress of wrongs and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge.’ ”
 
 Id.
 
 (quoting
 
 Boothby Realty Co. v. Haygood,
 
 269 Ala. 549, 554, 114 So.2d 555, 559 (1959)).
 

 A malicious-prosecution claim has five elements: “(1) a judicial proceeding initiated by the defendant; (2) the lack of probable cause; (3) malice on the part of the defendant; (4) termination of the judicial proceedings favorably to the plaintiff; and (5) damages.”
 
 Gulf States Paper Corp. v. Hawkins,
 
 444 So.2d 381, 387 (Ala.1983). In the present case, as previously noted, the trial court based its summary judgment in favor of Penske and Wallace on its conclusion that there was probable cause for the initiation of the criminal proceeding against Rogers. In
 
 Crim v. Crim,
 
 39 Ala.App. 413, 101 So.2d 845 (1958), the court defined probable cause for purposes of a malicious-prosecution claim as follows:
 

 “The expression ‘probable cause’ has been defined in
 
 Lunsford v. Dietrich,
 
 93 Ala. 565, 9 So. 308, 310 [(1891)], “‘a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.” ’ — citing
 
 Davie v. Wisher,
 
 72 Ill. 262 [(1874)]. Alternatively, in that case, the court quoted from
 
 Jordan v. Alabama Great So. R. Co.,
 
 81 Ala. 220, 8 So. 191 [(1886)], ‘ “probable cause is such a state of facts and circumstances as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that the person accused is guilty.” ’ ”
 

 39 Ala.App. at 417, 101 So.2d at 848.
 

 Rogers contends that the trial court erred when it entered the summary judgment in favor of Penske and Wallace on the basis that there was probable cause to prosecute him because, he says, in making that conclusion, the trial court improperly relied on the fact that he was indicted in January 2007. He argues that the subject of his present civil action against Penske and Wallace is the original criminal proceeding against him that ended in no indictment by the grand jury and the district attorney’s having the case nolle prossed. At the time of the initiation of that criminal proceeding, he argues, Bibb had yet to
 
 *790
 
 name him as his conspirator in the theft of the fuel, and, as a result, he argues, Penske and Wallace did not have probable cause to believe that he was guilty of stealing the fuel.
 

 We agree with Rogers that the fact that he was indicted by a grand jury in January 2007 for the theft of the fuel is not probative evidence that bears on the question of probable cause in this case. Our supreme court has indicated that the question whether a malicious-prosecution defendant had probable cause to institute a criminal proceeding is resolved by reference to the facts appearing before the defendant at the time that the criminal proceeding was instituted, not on the basis of facts that later develop or that are later discovered.
 
 See Fina Oil & Chem. Co. v. Hood,
 
 621 So.2d 253, 257 (Ala.1993) (“[I]t is clear from our cases that the existence of probable cause is to be judged in light of the facts as they appeared when the underlying action was filed.”);
 
 Eidson,
 
 527 So.2d at 1285 (“In determining whether probable cause existed, the court must weigh [the defendants actions in light of the facts as they appeared at the time the civil conspiracy action was filed.”).
 
 [3]
 
 Because the January 2007 indictment was based on evidence that was not before Penske and Wallace at the time the criminal proceeding was initiated against Rogers in late 2005, the trial court’s summary judgment is not properly justified by the fact of the indictment.
 

 However, the fact that the trial court’s reasoning does not support its judgment does not necessarily require this court to reverse the judgment. Instead, as noted above, this court can affirm a judgment if it is correct for any legal reason, subject only to the constraints of due process.
 
 See Brannan,
 
 supra. In the present case, Penske and Wallace sought a summary judgment on the bases that Rogers could not prove that they had initiated the criminal proceeding; that, if they did, they had lacked probable cause to do so; or that they had done so with malice. Because we conclude that, as a matter of law, there was probable cause, at the time that the criminal proceeding against Rogers was initiated, to believe that Rogers committed a crime, we conclude that the trial court’s summary judgment is due to be affirmed.
 

 As previously noted, probable cause is defined as “ ‘ “a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.” ’ ”
 
 Crim,
 
 39 Ala.App. at 417, 101 So.2d at 848. In the present case, it is undisputed that Bibb had fueled his truck at the Montgomery facility on multiple occasions; that, when his truck was impounded and searched, the police discovered 15 Penske fueling receipts in a glove compartment; that each of those receipts indicated that fuel represented by the receipt was dispensed on a day when Rogers was present and working at the Montgom
 
 *791
 
 ery facility; that each of those receipts contained Rogers’s initials in the “serviced by” field; that the back-up data on each of the receipts indicated that the fuel was dispensed at a time of the day when Rogers was present and working at the Montgomery facility; and that Rogers was the only CSR who was present and working at the Montgomery facility during each of the 15 transactions represented by the receipts. This undisputed evidence was sufficient, in our view, to “ ‘ “to warrant a cautious man in the belief that” ’ ” Rogers was involved in the theft of the fuel.
 
 Crim,
 
 39 Ala.App. at 417, 101 So.2d at 848.
 

 Rogers points to several facts, many of which are in dispute, that, he argues, create a fact question as to the existence of probable cause. Specifically, he argues that, at the time of the initiation of the criminal proceeding against him, Penske and Wallace knew: that Buffalo Rock’s drivers did not take their copies of fueling receipts and that those copies were thrown away; that fueling receipts had, for a substantial amount of time, been left in the fueling booth overnight and that some receipts had been misplaced; that Big Lots drivers often left their trucks in the parking lot of the Montgomery facility with their fueling receipts sitting on them; that Big Lots was reputed to check its fueling receipts and invoices; that neither Big Lots nor Buffalo Rock had complained on any of the 15 occasions represented by the fueling tickets found in Bibb’s truck about being charged for the fuel dispensed; that Bibb’s truck had been fueled at the Montgomery facility by 2 other CSRs, who were subsequently reprimanded for having done so; that Rogers had a good employee history during the 8 ½ years he had worked for Penske and its predecessor; that Buffalo Rock trucks were lined up to receive fuel at the time that the Montgomery facility opened in the morning and that it would have been difficult for a vehicle other than a Buffalo Rock truck to obtain fuel at that time; that Penske and Wallace were not going to check with Buffalo Rock or Big Lots to determine whether the vehicles listed in the receipts had actually received the fuel represented by the 15 fueling receipts; and that Rogers maintained that he had dispensed the fuel represented by the 15 fueling receipts but that he had done so into the vehicles listed on those receipts, not into Bibb’s truck. Based on their knowledge of these facts, Rogers argues, Penske and Wallace cannot be held, as a matter of law, to have acted in good faith or to have entertained an honest and strong suspicion that Rogers fueled Bibb’s truck rather than the vehicles listed on the fueling receipts.
 

 To be sure, the evidence on which Rogers relies in support of the above-listed facts sets forth a compelling case for a reasonable doubt as to whether he was guilty of the theft of the fuel. However, the existence of a reasonable doubt as to Rogers’s guilt does not mean that Penske and Wallace lacked probable cause to believe that he was guilty. To accept that Bibb stole the fueling receipts found in his truck’s glove compartment from the trash or from the fueling booth would be to accept as coincidence the fact that all 15 fueling receipts that he stole were for fueling that happened to occur at or around the same time of the day, that each fueling receipt represented fuel that had been dispensed on a different day, that Rogers happened to be logged into the fueling computer for each of the transactions listed in the fueling receipts, and that Rogers happened to be the only CSR whose work schedule had him present and working at the Montgomery facility during all 15 of the transactions the fueling receipts represented. Given the assumptions and coincidences that underlaid the alternative to guilt, we cannot escape the conclusion that,
 
 *792
 
 although there may have been a reasonable doubt about Rogers’s guilt, a reasonable person would have been warranted in the belief that Rogers had been involved in the theft of the fuel.
 
 [4]
 

 Because the facts before Penske and Wallace at the time the criminal proceeding was initiated against Rogers gave rise to probable cause for that proceeding, we conclude that the trial court properly entered a summary judgment in favor of Penske and Wallace on Rogers’s claim of malicious prosecution. As a result, the trial court’s summary judgment is affirmed.
 

 AFFIRMED.
 

 PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.
 

 [1]
 

 . Rogers’s complaint includes three separate counts. The parties have treated all three counts as alleging a single claim of malicious prosecution. Our review of the complaint leads us to conclude that the parties' treatment of the counts in that manner is appropriate, given that all three counts appear to state a single claim of malicious prosecution.
 

 [2]
 

 . Of course, the rule that we can affirm a trial court's judgment on the basis of any valid legal ground, whether or not considered by the trial court,
 

 "fails in application ... where due-process constraints require some notice at the trial level, which was omitted, of the basis that would otherwise support an affirmance, such as when a totally omitted affirmative defense might, if available for consideration, suffice to affirm a judgment ..., or where a summary-judgment movant has not asserted before the trial court a failure of the nonmovant’s evidence on an element of a claim or defense and therefore has not shifted the burden of producing substantial evidence in support of that element
 

 Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C.,
 
 881 So.2d 1013, 1020 (Ala.2003).
 

 [3]
 

 .
 
 See also Alabama Power Co. v. Neighbors,
 
 402 So.2d 958, 966 (Ala.1981) ("The burden of proof rested upon the plaintiff to show that there was a want of probable cause when the criminal matter against him was instigated.”); S.S.
 
 Kresge Co. v. Ruby,
 
 348 So.2d 484, 488 (Ala.1977) ("The question in an action for malicious prosecution arising from a criminal charge is whether the defendant, at the time he or she instituted the prosecution, had probable cause to believe that the accused was guilty.”);
 
 Dodson v. Ford Motor Credit Co.,
 
 46 Ala.App. 387, 390, 243 So.2d 43, 45 (Ala.Civ.App.1971) ("In determining whether Ford acted without probable cause in instituting the action in the Civil Court, we must weigh its action in light of the facts before it at the time the claim was filed, and not in light of facts appearing after the claim was filed.”).
 

 [4]
 

 . Our conclusion is not altered by the fact that there is evidence demonstrating that a grand jury reviewed the evidence against Rogers in January 2006, without the aid of Bibb’s subsequent implication of Rogers in the theft of the fuel, and failed to return a bill of indictment against him. Although, as Rogers points out, a grand jury's refusal to indict an individual shifts the burden to the malicious-prosecution defendant in the individual’s subsequent action against the defendant to prove that the defendant had probable cause to initiate the criminal proceeding against the individual, see
 
 Gulf States Paper Corp. v. Hawkins,
 
 444 So.2d 381, 388 (Ala.1983), the relative burdens of proof are not important in the present case because, as noted above, the undisputed evidence demonstrates that Penske and Wallace had probable cause to initiate the criminal proceeding against Rogers; in other words, Penske and Wallace met the burden of proof as to probable cause that was shifted to them by virtue of the evidence that the grand jury had refused to indict Rogers in January 2006.
 
 See id.
 
 (”[I]n cases where the only action has been a grand jury 'no bill,’ such is prima facie evidence only and the effect of its introduction is to shift the burden of proof to the defendant, thus requiring him to come forward with evidence that probable cause existed.... While such prima facie showings or presumptions are rebuttable, their purpose is to shift the burden of proof
 
 and not to create inferences of fact.”
 
 (emphasis added)).